**MISSOURI & IOWA RAILWAY CO., a**
**Missouri Railroad Corporation,**
**Appellant,**

v.

**NORFOLK AND WESTERN RAILWAY**
**CO., a Virginia Corporation,**
**Respondent.**

**MISSOURI & IOWA RAILWAY CO., a**
**Missouri Railroad Corporation,**
**Respondent,**

v.

**NORFOLK AND WESTERN RAILWAY**
**CO., a Virginia Corporation,**
**Appellant.**

Nos. WD 50044, WD 50061.

Missouri Court of Appeals,
Western District.

Sept. 5, 1995.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Oct. 31, 1995.

Application to Transfer Denied
Dec. 19, 1995.

David Allen Masters, Macon, for appellant/respondent.

Stephen M. Schoenbeck, St. Louis, for respondent/appellant.

Before KENNEDY, P.J., and SMART and LAURA DENVIR STITH, JJ.

KENNEDY, Presiding Judge.

This is an appeal by condemnation plaintiff Missouri & Iowa Railway Company from a judgment which awarded to the condemnation defendant (which was another railroad, the Norfolk and Western Railway Company) interest on the condemnation award from and after filing of the commissioners' report on December 7, 1993 to August 11, 1994, the date of the jury verdict, and which taxed court costs against the condemnation plaintiff. The amount of the commissioners' award was $4,000,000, and the jury award upon trial was $3,925,465. The amount of interest accrued to the time of the verdict (August 11, 1994) was $160,289.76. The subject of the condemnation action was a 87.82–mile length of railroad track and right-of-way, beginning at Moberly, Missouri, and going north to the Missouri–Iowa boundary.

The condemnation defendant also appeals, claiming that the trial court had no subject matter jurisdiction of the case, since its railroad property sought to be condemned was under the exclusive jurisdiction of the Interstate Commerce Commission. The condem-

nation plaintiff, on the other hand, claims that defendant had abandoned this segment of track and right-of-way under order of the Interstate Commerce Commission granting permission for abandonment, and that the Interstate Commerce Commission did not have jurisdiction.

## DEFENDANT'S APPEAL—SUBJECT MATTER JURISDICTION

■ We of course must take up first the cross-appellant's claim that the trial court did not have subject matter jurisdiction of the action for condemnation of the railroad property. This calls for a recounting of the history of the action.

Norfolk and Western owned and operated a 121.8–mile length of track and right of way extending from Moberly, Missouri, to Albia, Iowa, operating trains over it in the regular course of its railway business. This length of track and right-of-way includes the 87.82–mile portion from Moberly north to the Missouri–Iowa line.

The operation of the Moberly–Albia section was not profitable. Norfolk and Western, by petition filed September 30, 1992, applied to the Interstate Commerce Commission for permission to abandon this section. The ICC authorized the abandonment by order dated February 16, 1993, and served February 24, 1993.

Norfolk and Western claims that Federal law has pre-empted Missouri state law with respect to the railway property sought to be condemned here, and that the exercise of Missouri's laws of eminent domain conflict with Federal law that gives to the Interstate Commerce Commission jurisdiction over the abandonment of railroads. "Pre-emption arises in a wide array of contexts, from circumstances in which federal and state laws are plainly contradictory to those in which the incompatibility between state and federal laws is discernible only through inference." *Hayfield Northern R.R. v. Chicago and N.W. Transp.,* 467 U.S. 622, 627, 104 S.Ct. 2610, 2614, 81 L.Ed.2d 527 (1984).

It is clear that the Interstate Commerce Commission has jurisdiction over the abandonment of railroads. In pursuance of that jurisdiction, it entered an order dated February 16, 1993, upon the petition of Norfolk and Western, authorizing the abandonment of its Moberly–Albia section of 121.8 miles. Plaintiff Missouri and Iowa Railway cites for the proposition that the Interstate Commerce Commission had surrendered jurisdiction of this section of roadbed and track *Hayfield Northern,* 467 U.S. 622, 104 S.Ct. 2610, 81 L.Ed.2d 527, also a case in which one railroad corporation was seeking to acquire by state eminent domain procedures the abandoned right-of-way and track of another railroad corporation. Against the contention that the ICC's jurisdiction under Federal statutes excluded the exercise of eminent domain under state statutes, the Supreme Court held that the issuance of a certificate of abandonment by the ICC terminated its jurisdiction. Eminent domain proceedings were allowed to proceed.

Defendant N & W, on the other hand, cites footnote 11 of *Hayfield Northern* as authority for its position that the ICC had retained jurisdiction of this segment of railroad track and right-of-way to the exclusion of state eminent domain jurisdiction. Footnote 11 reads as follows:

> 11. This does not mean that in the postabandonment period, States are free to undo the very purposes for which the Commission authorized an abandonment. For example, if the Commission authorized an abandonment on the ground that relocation of the track was essential to enable the carrier to provide adequate service elsewhere, pre-emption would almost certainly invalidate a subsequent order by a state court barring such transfer.

467 U.S. at 633, 104 S.Ct. at 2617.

The parties debate the question whether the process of abandonment by N & W is complete, N & W arguing that its abandonment is not complete, and is therefore not abandonment. It appears to us that "abandonment" means abandonment *as a railroad* and does not mean the disavowal and disposition of all interest in the right-of-way and track. "[T]he disposition of rail property after an effective certificate of abandonment has been exercised is a matter beyond the scope of the Commission's jurisdiction, and

within a State's reserved jurisdiction. Questions of title to and disposition of the property are matters subject to State law." *Abandonment of Railroad Lines and Discontinuance of Service,* 365 I.C.C. 249, 261 (1981) *quoted in Hayfield Northern,* 467 U.S. at 634, 104 S.Ct. at 2617. The key question is, whether the Missouri condemnation statute, applied in the manner M & I proposes, "would obstruct the accomplishment of the objectives for which Congress enacted section 10905."[1] This principle does not require that ICC jurisdiction be terminated for every purpose before State jurisdiction may be exercised for any purpose.

We hold that the trial court had subject matter jurisdiction to proceed with the State eminent domain proceeding. The post-abandonment conditions contained in the ICC's exemption order, discussed in succeeding paragraphs, do not have the effect of excluding state court jurisdiction in the state eminent domain proceedings.

N & W, after applying for and receiving the certificate of exemption, took the following steps toward termination of its railroad operation on the line in question: It cancelled, effective May 25, 1993, all service to and from all stations between Moberly, Missouri, and Moulton, Iowa, both inclusive. It entered into a contract for track removal and began removing the track and track materials. (The continued track removal was stopped by the issuance of an injunction in connection with the condemnation suit.) N & W's intention permanently to cease service on the segment in question is unmistakable.

N & W emphasizes the provision in the ICC order of February 16, 1993, which states:

"2. Subject to the conditions set forth above, N & W may discontinue service, cancel tariffs for the line on not less than 10 days' notice to the Commission, *and salvage track and track material* consistent with interim trail use/rail banking after the effective date of this decision and notice. Tariff cancellations must refer to

this decision and notice by date and docket number." (Emphasis added).

N & W argues this brings the case within footnote 11 of *Hayfield Northern,* quoted above. We do not interpret the footnote to include such a case as the one before us. The footnote contemplates an ICC order that would find that "relocation of the track was essential to enable the carrier to provide adequate service elsewhere." There is no such finding here; the order simply allows the salvaging of the track, without any direction how or where it should be used. N & W did not interpret the order to have placed any restrictions on its use of the removed track. In one letter from N & W to a prospective buyer of the segment of the railroad, N & W indicated a purpose to place the salvaged track "in inventory." There is no difference between N & W's situation in this case and that of the abandoning railroad in *Hayfield Northern,* wherein the Supreme Court found that the fact that the condemnation suit would prevent the shifting of the track to "higher-value uses" elsewhere was not an impediment to the state court's eminent domain jurisdiction.

N & W points out that it continued, after the ICC's abandonment order of February 24, 1993, to serve Associated Electric Cooperative's power plant at Thomas Hill, over the south 15.3 miles of the track segment. Then on November 30, 1993, it leased that section of track to Lakeside Transportation L.L.C. The latter was formed to provide service temporarily to the Electric Cooperative. (Associated Electric on January 19, 1993, had entered into a contract with Burlington Northern to furnish rail service, and Burlington Northern was in the process of building track to the power plant. We gather the formation of Lakeside Transportation and its operation was to fill the gap between N & W's cessation of service to the power plant, and the commencement of Burlington Northern service.) The lease was for a year's term, from November 30, 1993, to November 30, 1994. When Lakeside actually ceased operations is not clear, but it had done so by March 10, 1995, when the ICC

---

1. 49 U.S.C. § 10905 of the Staggers Rail Act of 1980 deals with offers of financial assistance to avoid abandonment discontinuance.

gave Lakeside permission to discontinue service.

N & W points to the orders of the ICC—one approving the Lakeside lease, and the other permitting Lakeside's termination of service—as evidence that ICC was still exercising jurisdiction. (It should be observed that ICC's jurisdiction was not an issue in either order.) N & W supposes that the issues of abandonment and of ICC jurisdiction, must be decided as of the time the condemnation suit was filed, to wit, on October 1, 1993. N & W cites no authority for that proposition, and we see no merit in the idea. If the process of abandonment continues after the filing of the condemnation suit, and if it is completed during the pendency of the condemnation suit, it does not make sense to unwind the eminent domain proceeding to start over again. As a practical matter, the exercise of the state's eminent domain jurisdiction never at any time interfered with or conflicted with any residual ICC jurisdiction over the abandonment process. The abandonment proceeded in an orderly way, even as the eminent domain proceeding advanced.

N & W points to the ICC order's requirement that N & W negotiate requests for trail use and rail banking. This requirement, however, expired by its own terms on August 23, 1993 (which was 180 days after February 24, 1993, the service date of the February 16, 1993 ICC decision)—before the filing of the condemnation suit.

The following language is applicable to the case before us:

In addition, this (Interstate Commerce) Commission has plenary and exclusive jurisdiction over the abandonment of rail lines. Our jurisdiction operates to defeat the condemnation of rail property under state law. A finding by this agency that the public convenience and necessity permits the abandonment of a line is evidence in any court proceeding that the line is not required for rail service in interstate commerce and that our jurisdiction may not be used to shield a carrier from the legitimate process of state law. See Modern Handicraft, Inc.—Abandonment, 363 I.C.C. 969 (1981) (Modern Handicraft) and Kansas City Pub. Ser. Frgt. Operation—Exempt. Aban., 7 I.C.C.2d. 216 (1990) (Kansas City).

Chelsea Property Owners—Abandonment, 8 I.C.C.2d. 773, 1992 WL 233599, *2, 1992 I.C.C. Lexis 192, *4 (1992).

None of the requirements imposed upon N & W by the ICC abandonment order were such "post-abandonment conditions" as would deprive the state court of subject matter jurisdiction in the condemnation suit.

## PLAINTIFF'S APPEAL—SECTION 523.045 INTEREST

We turn now to Plaintiff Missouri and Iowa's appeal. It claims the trial court erred in giving judgment in N & W's favor in the sum of $160,289.76 as interest under section 523.045, RSMo1994 and Rule 86.

The commissioners assessed N & W's damages at $4,000,000. They filed their report on December 7, 1993. Missouri and Iowa did not pay the amount of the commissioners' award into court, nor did it elect to abandon the appropriation. N & W filed exceptions to the award and demanded a jury trial. After a jury trial, the jury awarded N & W $3,925,465. The date of the verdict was August 11, 1994, and judgment was entered September 12, 1994. The trial court added to the damage award a judgment for $160,-289.76, representing six percent per annum on the amount of the jury's damage award from and after the date of the commissioners' report until the date of verdict. Missouri and Iowa contends this judgment for interest is unwarranted and ought to be reversed, since M & I did not proceed to take possession of the condemned property.

N & W maintains, on the other hand, the judgment is mandated by section 523.045. The applicable part of that section reads as follows:

**Interest on awards payable when—enforcement.**—If, within thirty days after the filing of any condemnation commissioners' report under the provisions of section 523.040, the condemnor shall have neither paid the amount of the commissioners' award to the persons named in the petition as owning or claiming any property or

rights or to the clerk of the court for such named persons nor timely filed its written election to abandon the proposed appropriation of said property or rights, then interest on the amount of any subsequent verdict for said named persons, or if there be no such verdict, then on the amount of the award, at the rate of six percent per annum from the date of filing the report shall be added to said verdict or award and paid to said named person or to the clerk for them.

We sustain N & W's position, and affirm the trial court's award of interest. The statutory language is clear and unmistakable.

What effect is to be given to M & I's not taking possession of the condemned property? It likens its position to that of the condemnee who has not drawn down the commissioners' award which has been deposited with the clerk of the court by the condemnor. In such a case, it is held the condemnee is not liable for interest on the amount by which the commissioners' award exceeds the ultimate jury verdict. *State ex rel. State Highway Comm'n v. Paul,* 368 S.W.2d 419, 424 (Mo.banc 1963)

In *Paul,* the landowner had not drawn down the amount deposited by the condemnor into the court registry, but the condemnor claimed the landowner, under section 523.045, should be held to pay interest on the entire amount of the commissioners' award, which it had deposited with the court clerk, even though landowner had not drawn it down. Our supreme court held that the commissioners' award was "paid," within the meaning of section 523.045, only when landowner drew it down, not when it was deposited by the condemnor. *Paul,* 368 S.W.2d at 424. The landowner was therefore not obliged under section 523.045 to pay interest from the date of the deposit of the commissioners' award. The supreme court said that any other construction of the statute would raise serious constitutional questions.

*Paul* is not in point. *Paul*'s teaching with respect to the commissioners' award deposited with the clerk, and not drawn down by the condemnee, may not be applied to the land and property being condemned in this case. In the case of deposited funds, as one point

of difference between the two cases, the funds may be invested and the fund enhanced by the earnings. Section 483.310, RSMo1994.

M & I apparently would concede that if it had taken actual physical possession of the railroad, then it would have been liable for interest on the amount of the verdict for the time it was in possession. It says, though, that it did not take possession—that N & W in fact continued to use the railroad to the extent that it leased the southern end of the track (from Moberly north to Excello) to Lakeside Transportation and received $125,000 in rental between the time of the commissioners' report and the verdict.

We find no justification for disregarding the statute in its plain meaning. The statute in fact serves a worthwhile purpose. In this case, for example, the condemnor, in the absence of the statute, since it had not taken actual possession of the condemned property, could elect to abandon the condemnation at any time within 10 days after the finality of the judgment based upon the verdict, and walk away from it. See *State ex rel. Missouri Highway & Transp. Comm'n v. Turner,* 857 S.W.2d 293, 297 (Mo.App.W.D.1993); *Washington Univ. Medical Center Redevelopment Corp. v. See,* 654 S.W.2d 192, 194 (Mo.App.E.D.1983). Up to the time of the verdict, it could pay the commissioners' award, and could take possession of the property. The option belonged wholly to the condemnor. As an adjunct to its condemnation proceeding, M & I secured an injunction pendente lite to prevent N & W's removal of its railroad track. This injunction stood to cost N & W a considerable amount in the way of damages for breach of contract with United Rail Services, the entity which had contracted to remove the railroad track. The condemnee, on the other hand, in the absence of this statute, would receive no consideration for the condemnor's option. M & I by its condemnation suit could hold the condemned property hostage until the verdict set the price it had to pay, then exercise its option or release it. Section 523.045 is intended to rectify that inequity, and to compensate the condemnee for its loss of ability to deal with its property freely.

M & I says section 523.045 would be unconstitutional if interpreted to require payment of interest by condemnor to condemnee when condemnor had not taken possession of the condemned property, and we should therefore interpret the statute not to require such payment of interest. The principle invoked is the principle that, if the statute allows two different interpretations, one of which would make the statute unconstitutional, the interpretation should be favored which does not invalidate the statute. *Community Fire Protection District v. Board of Education*, 312 S.W.2d 75, 77 (Mo.1958). This is a statutory construction argument, not a challenge to the validity of the statute. If it were the latter, the jurisdiction of the case would belong to the Supreme Court. "It has repeatedly been held that a statute would conflict with a constitutional provision if construed in a certain way does not vest [the Supreme Court] with appellate jurisdiction." 312 S.W.2d at 77. This rule of statutory construction applies, however, only where the language of the statute admits of two different interpretations. The language of section 523.045 unequivocally requires the payment of interest by the condemnor, as adjudged by the trial court, and leaves no room for interpretation.

### SECURITY FOR PAYMENT OF JUDGMENT FOR INTEREST

■ During the pendency of the condemnation proceeding, the trial court, upon N & W's motion, ordered M & I to post security in the sum of $120,000 for the payment of such interest as M & I might become liable for under section 523.045. N & W tries to justify this order as an exercise of the court's inherent authority to carry out the judicial function, citing *State ex rel. Pulitzer Publishing Co. v. Coleman*, 347 Mo. 1238, 152 S.W.2d 640, 646 (Mo. banc 1941) (court has inherent power to punish civil contempts), and *State ex rel. Weinstein v. St. Louis County*, 451 S.W.2d 99, 101–102 (Mo. 1970) (Court has "authority to select and appoint employees reasonably necessary to carry out its functions of care, discipline, detention and protection of children who come within its jurisdiction, and to fix their

compensation. In order that the Court may administer justice under the Juvenile Code, it is essential that it control the employees who assist it.") N & W emphasizes the thin capitalization of M & I, and the certainty of a judgment for interest, even if M & I should abandon the condemnation. It cites no case, however, where the principle of inherent judicial power has been used to justify a court order requiring a litigant to secure the payment of a prospective judgment, and we do not think the principle can be extended that far. N & W's case of *Franke v. Franke*, 747 S.W.2d 202, 205 (Mo.App.E.D.1988), approved the court's requiring an insolvent father to post security for costs, which is specifically authorized by Rule 77.02. The court's order requiring M & I to secure $120,000 of any interest judgment against it was beyond the court's authority and is reversed.

### COSTS

■ Finally, M & I claims the court erred in taxing the costs of the proceeding against M & I. Section 523.070, RSMo1994 (rescripted in Rule 86.09) governs the taxation of costs in condemnation cases. That statute and rule read in part as follows:

> 523.070. **Costs, by whom paid.**—The cost of the proceeding to appropriate the right-of-way shall be paid by the company seeking the appropriation, up to and including the filing and copying of the report of the commissioners' and *the court, as to any costs made by subsequent litigation, may make such order as in its discretion may be deemed just.* (emphasis added).

We have reviewed the record and the authorities cited by the parties, and we find no abuse of discretion on the part of the trial court in taxing the costs of the proceeding against the condemnor.

The order is reversed which required M & I to post security for the payment of interest, but the judgment is affirmed in all other respects.

All concur.